FRETZ CONSTRUCTION COMPANY,
Petitioner,

v.

SOUTHERN NATIONAL BANK OF
HOUSTON, Respondent.

No. B–9570.

Supreme Court of Texas.

Nov. 4, 1981.

On Rehearing Jan. 27, 1982.

Bracewell & Patterson, William Fred Hagans and B. Thomas Cook, Houston, for petitioner.

Andrews, Kurth, Campbell & Jones, Fred Knapp, Jr., Houston, for respondent.

McGEE, Justice.

Fretz Construction Company (Fretz), a general contractor, sued Southern National Bank of Houston (Bank), the interim lender on a construction project, for damages for breach of contract, breach of third-party beneficiary contract, promissory estoppel, and fraud. In answers to special issues, the jury returned findings favorable to Fretz on its breach of contract, third-party beneficiary, and promissory estoppel claims, but failed to find all the elements needed for Fretz's fraud theory. The trial court disregarded the jury's answers under the contract and fraud theories and rendered judgment in favor of Fretz based on promissory estoppel. Both parties appealed. The court of civil appeals reversed the trial court's judgment on the promissory estoppel claim and rendered judgment for the Bank against all claims. 600 S.W.2d 878. Fretz has appealed to this Court claiming that there is evidence to support the jury's findings on the contract, promissory estoppel, and fraud causes of action; that the element of fraud which the jury failed to find was conclusively established; and that damages and prejudgment interest thereon were conclusively proven. We reverse the judgment of the court of civil appeals and remand the cause to that court.

In 1972, Fretz was approached by Joe Ross Stutts (Mr. Stutts) about building a 6-story office building, now known as the Bank of Woodlake, in Houston, Texas. Fretz and Mr. Stutts entered into a construction contract in 1973, but because of delays in Mr. Stutts' obtaining adequate financing, this contract was eventually cancelled. In 1974, Mr. Stutts secured a permanent loan commitment for the project in the name of Aqua-Con of South Texas, Inc. (Aqua-Con), of which Mr. Stutts was president. Mr. Stutts secured interim financing from the respondent Bank in the amount of $3,050,000.00. The Bank issued a letter of intent to make the loan on March 21, 1974, and Mr. Stutts, as president of Aqua-Con, signed loan documents bearing that date naming Fretz as general contractor. The Bank/Aqua-Con loan was "closed" around April 15, 1974.

During this time in 1974, Fretz was preparing to begin construction on the project. Fretz obtained a building permit on March 21 and moved onto the site on March 25. Fretz also received delivery of approximately $196,000 worth of steel for the project which it had ordered in 1973 under the previous construction agreement.

Since Aqua-Con was wholly owned by Mr. Stutts, Fretz was concerned about Aqua-Con's ability to pay for the construction work in view of the trouble Mr. Stutts had previously had in obtaining financing. On March 20 Fretz met with its surety, Travelers Indemnity Company (Travelers), and it was determined that both Fretz and Travelers needed assurances from the Bank that Fretz would be paid. An employee of Fretz, Mr. Ben Hammerle, contacted Mr. H. H. Kuhlman, the Bank's vice president in charge of real estate development, on March 22 or 25 and on other times thereafter. Mr. Hammerle testified that he expressed concern about getting paid for the construction work, and that Mr. Kuhlman assured him that $2,372,715.00 (the amount of the as yet unsigned construction contract between Fretz and Aqua-Con) would be set aside for Fretz and that no other costs or

fees would be paid out of that fund. There was also testimony that Travelers would require a letter from the Bank with those assurances before it would issue payment and performance bonds on Fretz. As a result, Mr. Kuhlman sent the following letter from the Bank to Travelers:

(LETTERHEAD OF SOUTHERN NATIONAL BANK)

April 2, 1974

Mr. L. L. Rhodes
Surety Department
Traveler's Indemnity Company
P. O. Box 1446
Houston, Texas 77001

Dear Mr. Rhodes:

   Re:  Payment and Performance Bonds
        Aqua-Con of South Texas, Inc.,
        Houston, Texas—Owner
        Fretz Construction Company—
        Contractor.

This is to confirm that $2,372,715.00, which represents the bonded construction costs of the above-captioned project to be owned by Aqua-Con of South Texas, Inc., has been set aside by Southern National Bank of Houston to be paid to Fretz Construction Company (Contractor) in progress payments as set out in the loan documents and construction contract. No brokerage fees, inspection fees, taxes, insurance, interest, or any other costs or fees incurred by borrowers or lenders will be removed from the contract sum.

Yours very truly,
/s/ H. H. Kuhlman, III
H. H. KUHLMAN, III
Vice President

HHK:oc

The letter was picked up from Mr. Kuhlman's office by Mr. Hammerle, who read it, made a copy of it for his files, and delivered it to Travelers. After reading this letter, Fretz delivered to Aqua-Con the signed Fretz/Aqua-Con construction contract dated March 28, 1974 and the payment and performance bonds issued by Travelers. Fretz also made the Bank an additional beneficiary of the payment and performance bonds and signed a Subordination Agreement and the Affidavit of Owners and Contractors required by the Bank.

Upon substantial completion of the project, Fretz submitted to Aqua-Con a request for final payment of $274,604.30. Fretz was paid only $50,000.00, however, which was all that remained from the loan proceeds. Fretz then brought this suit against the Bank.

Texas has adopted the doctrine of promissory estoppel as set forth by the Restatement of Contracts § 90. *Wheeler v. White*, 398 S.W.2d 93 (Tex.1965). Section 90 provides:

A promise which the promisor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promisee and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise.

In answer to special issues, the jury found all the necessary elements of promissory estoppel were present and the trial court rendered judgment thereon in favor of Fretz. The court of civil appeals reversed this portion of the trial court's judgment and rendered judgment for the Bank, holding that any promise made by the Bank was conditional and that the doctrine of promissory estoppel was not applicable.

Special Issue No. 9 was submitted to and answered by the jury as follows:

Do you find from a preponderance of the evidence that Southern National Bank promised Fretz Construction Company:

(a) That it would set aside the sum of $2,372,715.00 for the purpose of paying Fretz Construction Company for work on the Bank of Woodlake office building construction project?

Answer "we do" or "we do not."

ANSWER: "WE DO."

(b) That no brokerage fees, inspection fees, taxes, insurance, interest or any other costs or fees incurred by borrowers [Aqua-Con] or lenders [Bank] would be removed from such sum?

Answer "we do" or "we do not."

ANSWER: "WE DO."

■ The court of civil appeals held that the Bank had properly attacked the submission of Special Issue No. 9 in that it failed to contain the qualifying or conditional language set out in the April 2 letter from the Bank to Travelers. The Bank contends that any promise it made was a promise to *pay* Fretz "in progress payments as set out in the loan documents and construction contract." We hold that the Bank promised to *set aside* $2,372,715.00 and that no other costs or fees incurred by the borrowers or lenders would be paid from such sum. The promise to set aside and "protect" funds for payment to Fretz was not conditional, and the omission of the conditional language was not error.

Under the Bank/Aqua-Con loan agreement, the Bank agreed to loan a total of $3,050,000.00 and Aqua-Con was required to infuse an additional $525,000.00 into the project. Out of this total amount was to be paid the land acquisition costs, architectural fees, loan commitment fees, taxes, interest, appraisal and recording fees, and construction costs. Conditions for funding of the loan, in the form of advances and progress payments, included the requirements that Aqua-Con maintain a permanent take-out loan commitment, that Aqua-Con pay all taxes due on the property, that all construction work be approved by the Bank's inspecting architect, that the contractor should obtain a payment and performance bond, and that the work proceed according to a designated schedule.

The Bank contends it made no separate promises to Fretz; rather, it merely confirmed the fact that it was making a construction loan to Aqua-Con and that it would comply with the terms of that construction loan agreement. Mr. Kuhlman's assurances and the April 2 letter to Travelers, however, indicate that the Bank was undertaking an obligation above and beyond those contained in the Bank/Aqua-Con loan agreements. That additional obligation was to set aside a specified sum or money for payment to Fretz and to protect that fund from expenditures for other costs and fees. The Bank admitted that the funds were never set aside and that costs and fees incurred by Aqua-Con and the Bank totalling $867,613.23 were paid out of the $3,050,000.00 loan commitment.[1] This left $2,182,386.64 for payment to Fretz instead of the $2,372,715.00 promised by the Bank—a $190,328.26 deficiency.

The Bank next contends that any promise it made to Fretz incorporated all the terms and conditions contained in the Bank/Aqua-Con loan agreement and the Fretz/Aqua-Con construction contract; that those conditions were breached by both Aqua-Con and Fretz; and it was therefore under no obligation to pay Fretz the additional amounts for which it sues. This argument is misplaced. The promise made to Fretz was to set aside and protect certain funds. The conditions urged by the Bank were attached to the Bank's obligation to advance these funds to Aqua-Con, which in turn would make progress payments to Fretz under the construction contract. In essence, the Bank contends that Fretz was not damaged by its failure to set aside and protect funds because Aqua-Con's and Fretz's failures to comply with the loan and construction agreements relieved the Bank of its obligation to advance any money to Aqua-Con (for payment to Fretz). The Bank's argument is in the nature of confession and avoidance. It presented this argument as an affirmative defense in its motion for directed verdict, which was overruled by the trial court.

The Bank introduced evidence that Fretz breached the conditions of its construction contract by failing to complete tenant improvements and by failing to obtain an ap-

1. The following disbursements were made from the loan proceeds:

| | |
|---|---|
| Taxes | $ 8.00 |
| Interest to Bank | 19,268.67 |
| Land Release | 681,616.44 |
| Attorney's Fees | 6,700.00 |
| Title Binder | 30.00 |
| Recording Fees | 34.00 |
| Architectural Fees | 125,456.15 |
| Appraisal | 4,000.00 |
| Commitment Fees | 30,500.00 |
| | $867,613.26 |

proval certificate from the Bank's inspecting architect. The Bank also proved that Aqua-Con breached the loan agreement by failing to maintain a permanent financing commitment and by failing to pay property taxes. Fretz established, however, that the Bank made loan extensions to Aqua-Con after it learned of Aqua-Con's breaches; that the tenant improvement work was not completed by Fretz because there were no tenants who required the work; and that the Bank paid $50,000 on Fretz's last draw request without requiring a certificate from the architect. It was admitted by the Bank that it fully funded the entire loan amount to Aqua-Con regardless of the alleged breaches. There was testimony by Mr. Kuhlman that Fretz would have been paid if the Bank had not allowed payments for other costs and fees to be made from the specified funds.

This evidence does not conclusively establish the Bank's defensive theory, and the Bank did not request an issue on the question. Therefore, we do not need to consider Fretz's argument that the evidence conclusively establishes that the Bank waived any breaches.

The Bank has cited several cases in support of its contentions. These cases are not in point. In *Citizens National Bank v. Ross Construction Co.*, 146 Tex. 236, 206 S.W.2d 593 (1947), the Bank brought suit against the general contractor, Ross, to recover on a subcontractor's note and Ross's letter agreement to make payments due under the subcontract to the Bank and the subcontractor jointly. The letter which Ross sent to the Bank read:

This is to notify you of our recently executed contracts with the Campbell Electric Company, Brownwood, Texas, for electrical wiring of buildings in connection with our contract for Naval Air Facility at Durant, Oklahoma, and contract for Naval Air Facility at Conroe, Texas. The total amount of the two contracts is $22,354.68.

Mr. Campbell has requested that we give you this letter with instructions that all payments to him under these contracts are to be made payable jointly to Citizens National Bank, Brownwood, and the Campbell Electric Company.

*Id.* at 238, 206 S.W.2d at 594. This Court affirmed judgment for the defendant Ross, holding that the letter contained no promise by Ross; rather, the letter merely confirmed the fact that contracts in the stated amount had been executed and that the subcontractor had given Ross instructions that payments due under the contracts be made payable jointly to the Bank and the subcontractor. *See also Farmers State Bank v. First State Bank*, 317 S.W.2d 768 (Tex.Civ.App.—Waco 1958, no writ).

The Bank, however, not only confirmed that a construction loan had been made to Aqua-Con, but also that $2,372,715.00 of that loan had been set aside and that no other costs or fees incurred by Aqua-Con or the Bank would be removed from that sum.

*Stanley Furniture Co. v. Texas State Bank*, 425 S.W.2d 883 (Tex.Civ.App.—Austin 1968, no writ), cited by the court of civil appeals, involved a conditional promise to disperse funds held in escrow. There, the bank was acting as escrow agent for purchasers of furniture from Stanley. The intermediate purchasers had contracted to sell the furniture to Warren, and pursuant to that contract, Warren had deposited $5,000 in escrow with the bank. The bank then sent the following letter to Stanley:

At the request of ... Warren ... we wish to advise you that we are holding in escrow the $5,000.00 for the purchase of furniture. These funds will be released to you *upon written instructions* as indicated in the contract dated June 8, 1962.

425 S.W.2d at 884 (emphasis added). The bank never received the written instructions to disperse the funds to Stanley, and the court held promissory estoppel did not apply.

The Bank's promise to set aside and protect funds for Fretz was not conditional; rather, it was the Bank's obligation to pay those funds which were conditioned on Fretz's and Aqua-Con's compliance with their respective contracts. Thus, *Stanley Furniture* is not controlling.

The final case on which the Bank relies is *Briercroft Savings & Loan Ass'n v. Foster Financial Corp.*, 533 S.W.2d 898 (Tex.Civ. App.—Eastland 1976, writ ref'd n. r. e.). There, the interim lender, Foster, sued the permanent lender, Briercroft, based on the permanent lender's loan commitment which was never funded to the developer. The permanent lender had sent a letter to Foster which confirmed that a loan commitment had been made and that Briercroft "will endeavor to make this transaction acceptable to your institution." *Id.* at 900. The court held that this was not a promise, and further emphasized that there was no promise by Briercroft to protect Foster's interim loan to the developer on which Foster could rely.

■ A promise to protect another's interest, which the court held was absent in *Briercroft*, is precisely what the Bank promised to Fretz. Therefore, we hold that promissory estoppel is applicable.

■ The Bank also contends there is no evidence to support the jury's findings that Fretz did rely on the Bank's promise; that such reliance should reasonably have been expected by the Bank; that it would be unjust to permit the Bank to deny its promise; and that Fretz expended $108,489.00 in reliance on such promise which was not recovered. We disagree.

Fretz had previously entered into a construction contract with Aqua-Con in 1973, which contract was eventually cancelled. The final contract between Fretz and Aqua-Con was dated March 28, 1974, but was not delivered by Fretz to Aqua-Con until after Mr. Kuhlman's conversations with Mr. Hammerle and Mr. Kuhlman's letter to Travelers. Additionally, Fretz did not deliver the payment and performance bonds until after this time. We hold that this is some evidence of reasonable reliance by Fretz which could support the jury's answer thereon.

Furthermore, there is evidence to support the jury's finding that the Bank should reasonably have expected Fretz to rely on its promises. There was testimony that Mr. Hammerle and Mr. Price, an agent for Travelers, told Mr. Kuhlman that Fretz needed these assurances before it could proceed, and that Mr. Kuhlman had submitted the April 2 letter to the Bank's attorneys to determine what additional obligations it was undertaking.

■ Finally, the Bank contends that the jury improperly awarded the difference between the original contract price of $2,372,-715.00 and the amount paid to Fretz, which was $2,264,226.00, because such figure included a contractor's fee of $125,000.00. Furthermore, there was evidence which indicated Fretz had already expended $215,-625.00 prior to the Bank's April 2 letter. Damages recoverable in a case of promissory estoppel are not the profit that the promisee expected, but only the amount necessary to restore him to the position he would have been in had he not acted in reliance on the promise. *Wheeler v. White*, 398 S.W.2d 93 (Tex.1965); *E. F. Hutton & Co. v. Fox*, 518 S.W.2d 849 (Tex.Civ.App.— Dallas 1974, writ ref'd n. r. e.).

Fretz's prior expenditures included more than $196,000.00 for steel ordered under the 1973 contract. There was evidence, however, that Fretz could have sold the steel or used it in other projects had it not undertaken actual construction. There was also evidence of work done, in addition to that covered by the original contract, pursuant to change orders and oral agreements between Fretz and Aqua-Con. These added approximately $185,000.00 to the original contract price. The jury was entitled to consider these factors in determining what amount Fretz had expended in reliance on the Bank's assurances.

The Bank contends that it was not a party to the change orders or the oral agreement, and that such work could not reasonably have been foreseeable to it. There was evidence, however, that the Bank knew of the construction contract provisions for change orders and had delegated the responsibility for approving such change orders to its inspecting architect, who did in fact approve the first two change orders. The third change order,

which was not approved by the inspecting architect, was a credit of $67,589.00 and reduced the total amounts due, thereby benefitting the Bank. Furthermore, the work performed pursuant to the oral agreements was work which was called for under the original contract. We hold that this is some evidence to support the jury's findings that Fretz's performance was foreseeable.

Fretz also contends there is some evidence to support the jury's findings on its contract and third-party beneficiary contract causes of action.

In answer to Special Issue No. 1, the jury found that the Bank agreed with Fretz to set aside $2,372,715.00 and that no brokerage fees, inspection fees, taxes, insurance, interest or other costs and fees incurred by Aqua-Con or the Bank would be removed from that sum. In Special Issue No. 2, the jury found that the Bank failed to comply with such agreement and as a result Fretz suffered damages of $108,489.00. The jury also found, in Special Issue No. 3, that the April 2 letter from the Bank to Travelers was intended for the direct and primary benefit of Fretz. The trial court, on the Bank's motion, disregarded the answers to Special Issues Nos. 1 and 3 and the court of civil appeals affirmed without discussion.

We hold that the evidence discussed above is some evidence to support the jury's answers and that the courts below erred in disregarding these answers. The Bank had alternatively contended, by cross points to the court of civil appeals, that the evidence was insufficient to support the jury's answers on each theory of recovery and that such answers were against the great weight and preponderance of the evidence. These points were not reached by that court. Because we do not have jurisdiction to consider insufficient evidence points, Fretz's promissory estoppel, contract, and third-party beneficiary claims must be remanded to the court of appeals. *Stanfield v. O'Boyle*, 462 S.W.2d 270 (Tex.1971). We do not reach Fretz's second and third points of error concerning the trial court's failure to disregard the jury's answers as to damages and enter a larger amount as a matter of law and its failure to award prejudgment interest.

As to Fretz's fraud cause of action, the jury found that the Bank's representation to set aside $2,372,715.00 for payment to Fretz was not false when made. Fretz contends in its eleventh point of error that the trial court erred in failing to disregard this answer. In order to sustain this point, Fretz must show that it proved such representation was false when made as a matter of law. *Texas & N.O.R.R. v. Burden*, 146 Tex. 109, 203 S.W.2d 522 (1947).

Fretz relies on a statement by Mr. Kuhlman that the funds were not set aside on April 2, 1974 (the date of his letter to Travelers), and were in fact never set aside. There was also evidence, however, that the Bank's representation to "set aside" funds was not a representation to *physically* segregate these funds from the remaining proceeds of the loan, and that Fretz did not understand it to mean otherwise. The jury's answer to this special issue should be read in conjunction with its answers to other special issues in which it was found that the Bank promised and agreed to set aside and protect the funds from other costs and fees. As such, the jury could have concluded that the essence of the Bank's representation was really a future promise to protect those funds "set aside." Special Issue No. 5 inquired only into the representation to set aside funds, and not whether the Bank falsely represented that it would protect those funds from other costs and fees. Thus, we find some evidence to support the jury's answer and overrule Fretz's eleventh point of error. *See* Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Texas L.Rev. 361, 363–64 (1960).

The judgment of the court of civil appeals is reversed and the cause is remanded to that court for its consideration in accordance with this opinion.

WALLACE, J., notes his dissent.

## ON MOTION FOR REHEARING

McGEE, Justice.

In its motion for rehearing the Bank has correctly pointed out that its inspecting ar-

chitect had no authority to approve change orders. The Bank reasserts its contention that it was not a party to the change orders or the oral agreements, and that work performed by Fretz pursuant thereto could not reasonably have been foreseeable to it. We note our error, but find no basis on which to alter our holding. The construction contract, of which the Bank was aware, specifically provided for change orders. There was no evidence, however, that the Bank would ever require prior approval of any work done of this type. Rather, the Bank's primary concern under the loan agreement was that the work be done properly before it would authorize a draw request to Aqua-Con, who would then pay Fretz for the work done. In fact, the Bank's inspecting architect was hired to review the change orders and to advise the Bank as to their effect on the cost of construction. Thus, any change orders or other additional costs were foreseeable to the Bank so long as the final cost of such work did not exceed a previously expected sum. While such sum under the Bank/Aqua-Con loan agreement was $3,050,000.00 for the entire project, the Bank's promise to set aside $2,372,715.00 for payment to Fretz is some evidence that the Bank could have reasonably foreseen construction costs up to that amount. The amount awarded by the jury, when added to the amount paid by the Bank (through Aqua-Con) to Fretz, does not exceed that amount.

The motion for rehearing is overruled.